UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :

MICHAEL SHANE ENTERPRISES, LLC,      :

        Plaintiff,                        :              INDEX NO. 16-CV-_____

      v.                                   :

                                      :              **COMPLAINT**

COURTROOM CONNECT, LLC,           :
COURTROOM CONNECT, INC.,         :
COURTROOM CONNECT CORP., DAVID  :              **JURY TRIAL DEMANDED**
FEINBERG, and KENNETH FEINBERG,  :

        Defendants.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       Plaintiff Michael Shane Enterprises, LLC ("MSE") by its attorneys, Creizman PLLC, for its complaint, alleges as follows:

## INTRODUCTION

       1.     Courtroom Connect is a business that provides legal industry-related products and services to attorneys, law students, and corporations. Founded in 2001, Courtroom Connect's earliest investors were well-known attorneys Ken Feinberg and David Boies. Over the years, Feinberg and Boies each invested close to six million dollars in Courtroom Connect and maintained controlling interests in the business. Because Feinberg and Boies were occupied with their respective law practices, in approximately 2001, Ken Feinberg assigned his brother David, who Ken also employed as his business manager, to oversee Courtroom Connect's operations.

       2.     By 2006, Courtroom Connect was deep in the red and struggled to stay afloat, increasingly requiring David Feinberg from time to time to call on his brother and Boies to invest additional funds in the business. Concerned about his brother's substantial investment in a failing company, David decided to take a more active role in Courtroom Connect's affairs and

asked its then CEO and co-founder to step down. Within a year, David hired a new CEO for Courtroom Connect, but the business still foundered.

3. Over the next three years, David Feinberg injected funds into the company through millions of dollars in additional contributions from Ken Feinberg and David Boies, and by drawing down extensively on a $3.5 million line of credit that he had obtained from Brown Brothers Harriman bank during Courtroom Connect's early years. But those millions of dollars in withdrawals also did not improve Courtroom Connect's financial condition, and merely prolonged what appeared to be the inevitable collapse of the business.

4. The impending failure of Courtroom Connect presented more severe consequences for David than merely tarnishing his reputation as a businessperson. Because what no one knew—and what David and Ken Feinberg admitted only recently in sworn testimony—was that David had *fraudulently* procured that $3.5 million line of credit by *forging* Ken Feinberg's signature as a personal guarantor. (Relevant excerpts of David Feinberg and Ken Feinberg's sworn testimony, taken on September 28, 2015, are annexed to the Complaint as Exhibits A and B.). By 2010, David had drawn down $2.5 million on that fraudulently-obtained line of credit—and within a few years after that, all of it— in order to fund Courtroom Connect.

5. With Courtroom Connect teetering on the brink of failure, David Feinberg took over as CEO. The stakes were enormous for David Feinberg. If Courtroom Connect were to collapse, Ken Feinberg not only stood to lose the several millions of dollars he had voluntarily invested in the business and entrusted to his brother's judgment, but he would be on the hook for an additional $3.5 million that he had unwittingly poured into Courtroom Connect thanks to his brother.

6. Not only that, but in David's role as Ken's business manager, he had prepared numerous financial statements for Ken's firm and for Ken personally, and *never* disclosed Ken's multi-million-dollar obligation under the fraudulently-obtained line of credit.  As David Feinberg has also admitted in sworn testimony, certain personal financial statements that he prepared for Ken were submitted to financial institutions which Ken signed *under penalty of perjury*.  Thus, David knowingly caused *additional false statements* to be submitted to financial institutions which his brother unwittingly represented under oath to be truthful.

7. Aside from possible criminal exposure, David reasonably understood that his livelihood was at stake if his forgery were discovered.  For decades, Ken was David's longtime employer and his sole source of income—an income exceeding $900,000 per year.  If Ken found out about the forged signature, or his $3.5 million obligation to Brown Brothers Harriman that David ran up without his knowledge or permission, or that David was responsible for Ken submitting false financial statements to banks and lenders, the consequences could well be David's job, if not jail.  Thus, David literally could not afford to let Courtroom Connect fail.  (Fortunately for David, even after Ken discovered the forged application in November 2013, he continues to employ David as his business manager at the same annual salary of $900,000.).

8. Faced with a compelling purpose to save the business, David had few options.  Courtroom Connect had no chance of obtaining credit or finding an interested buyer.  So he turned to his childhood friend Michael Shane, an entrepreneur who had a remarkably successful track record in sales and marketing.  David, Ken, and Michael had spent their summers together growing up in Massachusetts and maintained their friendship over the years.  From time to time, David and Michael would meet socially and David would discuss Courtroom Connect's financial problems and pick Michael's brain about the business.

9. In 2011, David Feinberg and Michael Shane began communicating more frequently and in more detail about Courtroom Connect's financial circumstances. They discussed concrete ways in which Shane could help the company grow through sales and marketing, become more profitable as an ongoing concern, and become more attractive to institutional lenders and potential purchasers. Feinberg decided that Courtroom Connect would retain Shane, through Michael Shane Enterprises, LLC ("MSE"), under a compensation structure that provided for: (i) consulting fees and sales commissions on an ongoing basis and (ii) equity interests in Courtroom Connect.

10. After Shane began his consulting work for Courtroom Connect, he gradually invested more and more of his time to the point where he virtually became a full-time employee, devoting well over 40 hours a week to his work for the company. His duties required frequent business travel, including many trips to Washington, D.C. to meet with David Feinberg and other company officers, trips to Courtroom Connect's offices in Atlanta, Philadelphia, and California, and sales pitches and business meetings in New York, Chicago, Philadelphia, Boston Delaware, South Florida, and the Washington, D.C. metropolitan area. In late 2012, David Feinberg assigned Shane the official title of "Chief Marketing Officer" of Courtroom Connect.

11. In light of Shane's increased responsibilities and commitments to Courtroom Connect, Feinberg and Shane made substantial modifications to the formal consulting agreements that Courtroom Connect had initially entered into with MSE. Accordingly, Courtroom Connect and MSE entered into new contracts that specifically delineated MSE's more substantial duties and responsibilities to the business, and which concomitantly increased both components of MSE's compensation package in terms of ongoing fees and sales commissions and equity interests in Courtroom Connect.

12. Shane's contributions to the company were concrete and substantial. Indeed, Shane delivered the kind of results Feinberg had hoped for and believed Shane would accomplish. From the moment Shane began formally providing consulting services to Courtroom Connect, Shane worked with Feinberg to create sales and marketing plans in order to improve the business's prospects for a sale. He also carried out a number of initiatives that helped improve Courtroom Connect's marketability.

13. Among other things, Shane reviewed the performance and compensation of the company's officers and employees and restructured their duties and responsibilities to maximize efficiency and improve the company's work product. He also helped clean up the business systems of Courtroom Connect. For instance, he had the company collect its receivables by credit cards to improve cash flow. Shane also developed a relationship with LexisNexis, which generated a $300,000 advance for the Company that Feinberg told Shane "saved the company."

14. Shane implemented numerous branding, advertising, and public relations strategies that boosted the company's profile and increased its revenues. He also was responsible for Courtroom Connect's purchase of the domain name, CVN.com, which now hosts the website of its Courtroom View Network brand. This acquisition ensured Courtroom Connect's survivability and gave it the potential for future growth. Today, the CVN website offers attorneys, law students, and businesspeople an extensive catalog of live and on-demand trial videos and training programs. For the first time, it is supported by advertising revenues, a strategy Shane implemented while consulting for Courtroom Connect.

15. During Shane's tenure as a consultant, Shane and David Feinberg occasionally met with Ken Feinberg and with David Boies and discussed the improvements that Shane had brought to the company. Both in person and through David Feinberg, Ken Feinberg consistently

and enthusiastically expressed his appreciation for Shane's meaningful contributions to the company.  Likewise, after one meeting that David Feinberg and Shane had with David Boies, Boies invested additional monies into Courtroom Connect.

16. For his part, David Feinberg believed that Shane's services were so valuable and that the results he achieved were so substantial that, unbeknownst to Shane, he *personally* advanced his *own money*—over $500,000 in the aggregate—to Courtroom Connect so that the company could pay MSE's consulting fees.

17. In September of 2013, Ken Feinberg, who, despite his controlling financial interest in the business, had paid little attention to the day-to-day affairs of Courtroom Connect, discussed with his son Andrew the possibility of having Andrew replace David as CEO of Courtroom Connect.  Andrew, who was then employed by the United States Consumer Protection Bureau, expressed interest in the position.  Accordingly, Ken decided that Andrew would review the company's books and records and its existing contracts.

18. In November 2013, while performing his due diligence of the company, Andrew Feinberg discovered the $3.5 million line of credit that David had fraudulently obtained and had by that point completely drawn down.  Andrew immediately told his father about the existence of this personal $3.5 million debt.  After Ken reviewed the underlying application, he discovered that his signature as a personal guarantor was forged.  Ken confronted David with the document, and David confessed to the forgery.  (*See* Ex. B).  Ken terminated David as CEO and as a board member of Courtroom Connect.

19. A few days later, Andrew Feinberg found the operative written consulting contracts between Courtroom Connect and MSE.  On November 18, 2016, Ken Feinberg emailed Shane a letter repudiating Courtroom Connect's contracts with Shane, declaring that the

contracts were "null and void, have no legal effect, and were entered into without the permission, consent or knowledge of the Members of the Board of Directors of the Company."

20. When Shane called Ken Feinberg to discuss the letter, Feinberg threatened Shane that "[i]f you contest these agreements, if you try to enforce these agreements, I'm going to have David Boies chase you for ten years."

21. Notwithstanding the discovery of the forgery, Ken Feinberg still employs David Feinberg as his business manager at a salary of over $900,000 per year. Indeed, David Feinberg has assisted, and continues to assist the firm in its mediation, settlement, and administration of high-visibility, complex claims—which have included the September 11th Victim Compensation Fund, the BP Deepwater Horizon Oil Spill Fund, and massive, complex product liability class action lawsuits involving asbestos and Agent Orange. Mr. Feinberg now implausibly claims that although he signed the agreements with MSE as CEO of Courtroom Connect, he never believed that the agreements were binding on the company or that he had the authority to bind Courtroom Connect to those agreements.

22. Shane brings this action against Defendants seeking damages arising from their conduct.

## PARTIES

### Plaintiff

23. Plaintiff, MSE, is a limited liability company duly organized under the laws of Florida and maintains its principal place of business in Florida. MSE is a strategic marketing and consulting firm that focuses on assisting business enterprises in becoming profitable and attractive to purchasers, as well as creating new businesses. Its principal officer, Michael Shane, is a lifetime entrepreneur with a successful track record in sales and marketing.

**Defendants**

24.     Courtroom Connect is a business that offers legal industry-related products and services through two principal business units: Remote Counsel and Courtroom View Network ("CVN").  Among other things, Remote Counsel provides real-time access to depositions and trial proceedings through the streaming of transcripts, videoconferencing, and teleconferencing.  CVN delivers live and on-demand video and editorial coverage of court hearings and trial proceedings, which allow attorneys, corporate counsel, corporate officers, and shareholders to follow relevant proceedings remotely.  In addition, attorneys and law students access CVN's on-demand video library for training purposes and research on judges and opposing counsel.  Courtroom Connect's headquarters are located in Atlanta, Georgia.

25.     Defendant Courtroom Connect, Inc., a Delaware Corporation, owned and operated the Courtroom Connect business during the period MSE provided consulting services to the business as described in this Complaint. During that period, the principal investors in the business were attorneys Kenneth Feinberg and David Boies and their family members.  During the same time period Defendant Courtroom Connect Corp., a Virginia corporation, operated the Courtroom Connect business both in and from the State of Virginia, and was also used as a trade name of the business.  In either case, Defendant Courtroom Connect Corp. is an alter-ego of Courtroom Connect, Inc.

26.     Defendant Courtroom Connect, LLC, a Delaware limited liability company, presently owns and operates the Courtroom Connect business and is a successor-in-interest to Courtroom Connect, Inc.  In October 2015, Aerial Holdings, Inc. ("Aerial") acquired a 51% ownership interest in the business and became a 51% member of Courtroom Connect, LLC.  Courtroom Connect, Inc. is also a member of Courtroom Connect, LLC.  To avoid confusion, in

this Complaint, the various Courtroom Connect entities will be referred to collectively as "Courtroom Connect" unless it is otherwise necessary to identify the specific entity.

27. Defendant Kenneth ("Ken") Feinberg is an attorney specializing in mediation and alternative dispute resolution and has served as an administrator and special master in several high profile matters. He resides in Bethesda, Maryland. Ken Feinberg was one of Courtroom Connect's earliest and largest investors and is a member of the board of directors of Courtroom Connect.

28. Defendant David Feinberg is Ken Feinberg's brother, and he resides in Bethesda, Maryland. David Feinberg has long been, and continues to be employed as a business manager for Ken Feinberg's law firm and has worked on several of the firm's claims administration projects. As David Feinberg has admitted in sworn testimony, from approximately 2001 through November 2013, he exercised authority to make decisions for Courtroom Connect in all aspects of its business without approval of its Board of Directors, including the hiring and firing of the company's officers, and entering into contracts on behalf of the company. David Feinberg served on Courtroom Connect's board of directors virtually from its inception until November 2013 and as its CEO, its COO, and an officer at alternating times during that period.

## JURISDICTION AND VENUE

29. Jurisdiction is conferred over this action pursuant to 28 U.S.C. § 1332 (a)(1) because the amount in controversy exceeds $75,000 and the Plaintiff and Defendants are citizens of different states.

30. Venue is proper in this District with respect to Defendants Courtroom Connect, LLC, Courtroom Connect, Inc., and Courtroom Connect, Corp. because they have conducted and continue to conduct business in the State of Florida and in this

District.  In addition, Courtroom Connect, Inc. is a foreign corporation licensed to do business in the State of Florida.

31. Venue is also proper in this District with respect to all Defendants because the acts and omissions of the Defendants giving rise to the claims herein were directed towards, and caused serious injury to, a resident of this District.

## STATEMENT OF FACTS

32. Paragraphs 1-30 are incorporated herein by reference.

33. As discussed above, Shane and David Feinberg agreed that the compensation package for MSE's consulting services would have two components, reflecting MSE's efforts to grow the company's sales and marketing, and to attract potential purchasers and lenders: (i) ongoing fees and sales commissions; and (ii) equity interests in Courtroom Connect.

34. In February 2012, Shane and David Feinberg executed a contract between MSE and Courtroom Connect called the "Sales Commissions Agreement," which agreed to compensate MSE for its consulting services at a flat monthly fee of $5,000 plus monthly commissions in the amount of 10% of all of Courtroom Connect's monthly gross sales volume over $50,000 derived from certain specified products and services.  (The Sales Commissions Agreement is annexed hereto as Exhibit C.).

35. In April 2012, in consideration for Shane's work on making the business more attractive to potential lenders and purchasers, David Feinberg and Shane executed an agreement between Feinberg and MSE entitled the "Equity Share Agreement" under which Feinberg agreed to transfer 30% of his ownership interests in Courtroom Connect to MSE in the event Courtroom Connect was sold or if Courtroom Connect raised a round of financing.  (A copy of the Equity Share Agreement is annexed hereto as Exhibit D.).

36. By December 2012, Shane's consulting services had been greatly expanded to the point that he was essentially devoting all of his professional time to Courtroom Connect. In recognition of those circumstances and Shane's meaningful contributions to the business, MSE's compensation package was modified by increasing MSE's consulting fee to $7,700 per week and altering the nature of MSE's equity interest in Courtroom Connect in the event of a sale.

37. Accordingly, Feinberg and Shane executed an "Equity Transaction Agreement" among Courtroom Connect, MSE, and Feinberg that explicitly modified and superseded the previous agreement concerning the equity component of MSE's compensation package.[1] It expressly did not affect any other agreements, and specifically, the ongoing payment of consulting fees and commissions. The Equity Transaction Agreement provided for a ten-year term and specifically delineated MSE's duties and responsibilities to the company. It also provided that MSE would receive 10% of the gross proceeds of an "Equity Transaction" closed during the ten-year term of the Equity Transaction Agreement. An "Equity Transaction" was defined as:

> "(i) any sale of the Company or any division or department thereof to any entity, whether or not introduced to the Company directly or indirectly by [MSE], whether by way of stock sale, reorganization, merger, asset sale, or otherwise, and (ii) any round of financing raised by the Company, either directly, indirectly, or through one of the Company's Affiliates, whether by equity transaction, debt, convertible debt, public offering or other vehicle, and whether or not from or through an entity introduced to the Company directly or indirectly by [MSE].

---

[1] Because the Equity Share Agreement was between MSE and Feinberg in his personal capacity, and the Equity Transaction Agreement superseded that earlier agreement, Feinberg was a necessary party to the contract.

11

The Agreement further provided that in the event of an initial public offering, Shane would be entitled to 10% of the market capitalization of the Company. (A copy of the Equity Transaction Agreement is annexed hereto as Exhibit E).

38.     Contemporaneous with the execution of the Equity Transaction Agreement, Feinberg gave Shane the official title of "Chief Marketing Officer" of Courtroom Connect. In addition, Courtroom Connect began paying and continued to pay MSE's new agreed-upon consulting fee of $7,700 per week. Approximately four months after executing the Equity Transaction Agreement, Feinberg and Shane executed a "Strategic Marketing Agreement" between Courtroom Connect and MSE in April 2013, which memorialized MSE's agreed-upon ongoing fees and commissions component of its compensation package for consulting services. The Strategic Marketing Agreement thus explicitly modified and superseded the earlier Sales Commissions Agreement.[2]

39.     The Strategic Marketing Agreement also specifically referred to the Equity Transaction Agreement and distinguished between the two agreements as follows: "The Equity Transaction Agreement provides compensation to [MSE] for the services set forth in Section A, therein and hereinbelow, however, the compensation [under the Equity Transaction Agreement] is only in the event of an Equity Transaction. Th[e] [Strategic Marketing Agreement] provides compensation for these services on an ongoing basis." The Agreement thus formalized in writing the compensation structure that the parties had agreed to from the beginning.

---

[2] Because the earlier Sales Commissions Agreement was between Courtroom Connect and MSE only, the Strategic Marketing Agreement that superseded it did not require the signature of David Feinberg in his personal capacity, unlike the case with the Equity Transaction Agreement, which superseded an agreement between Feinberg and MSE.

40. Furthermore, the Agreement explicitly did not supersede the Equity Transaction Agreement: "[B]oth this Agreement and the Equity Transaction Agreement provide the appropriate and agreed upon compensation to [MSE] for [MSE's consulting services as defined in the Agreements.]" (A copy of the Strategic Marketing Agreement is annexed hereto as Exhibit F.).[3] The Strategic Marketing Agreement provided for a term that would run concurrently with the ten-year term under the Equity Transaction Agreement.

41. In November 2013, Ken Feinberg repudiated the Equity Transaction Agreement and the Strategic Marketing Agreement, and terminated MSE's consulting services. Shortly thereafter, Andrew Feinberg became CEO of Courtroom Connect.

42. In August 2015, Courtroom Connect, Inc. and Aerial Holdings, LLC entered into a loan agreement. Under that agreement, Aerial extended a revolving credit facility to Courtroom Connect, Inc. in exchange for Courtroom Connect, Inc. issuing Aerial a convertible promissory note.

43. In October 2015, the Courtroom Connect business was reorganized, with Aerial acquiring a 51% interest in the business. In order to effectuate this acquisition, a new entity, Courtroom Connect, LLC, was formed. Courtroom Connect, LLC issued 51% of its membership interests to Aerial, and most, or all of the remaining 49% membership interests to Courtroom Connect, Inc.

---

[3] In a previously-filed action based on the same underlying facts, the Court entered a final order of summary judgment on claims arising from Courtroom Connect's breach of the Strategic Marketing Agreement and permitted MSE to withdraw its remaining claims with respect to the Equity Transaction Agreement without prejudice. MSE has appealed from that order and, if successful, intends to reinstate the breach of contract and promissory estoppel claims against Courtroom Connect arising from its repudiation of the Strategic Marketing Agreement.

**FIRST CLAIM FOR RELIEF**
**(Against Defendants Courtroom Connect, Inc.,
Courtroom Connect, LLC, and Courtroom Connect Corp.)**

**Breach of Contract**

44. Plaintiff realleges each and every prior allegation herein.

45. Plaintiff performed its obligations under the Equity Transaction Agreement.

46. Defendant Courtroom Connect, Inc. repudiated the contract on or about November 18, 2013, unequivocally, absolutely, and without lawful or other justification.

47. Furthermore, under the Equity Transaction Agreement, Defendant Courtroom Connect, Inc. is obligated to compensate Plaintiff a sum in the event an Equity Transaction as defined under that agreement closes during the ten-year term of the agreement.

48. An Equity Transaction as defined under the Equity Transaction Agreement closed in or about October 2015, during the ten-year term of the agreement, and Defendant Courtroom Connect, Inc. has not compensated Plaintiff as required under the agreement.

49. Accordingly, Defendant Courtroom Connect, Inc. has breached the Equity Transaction Agreement by failing to perform its obligations under the agreement, and by anticipatorily repudiating the agreement.

50. Courtroom Connect, LLC is liable to Plaintiff for Courtroom Connect, Inc.'s breach of the Equity Transaction Agreement, as a successor-in-interest or alter-ego of Courtroom Connect, Inc.

51. Courtroom Connect Corp. is liable to Plaintiff for Courtroom Connect, Inc.'s breach of the Equity Transaction Agreement, as an alter-ego of Courtroom Connect, Inc.

52. As a direct and proximate result of Defendant Courtroom Connect, Inc.'s breach of the Equity Transaction Agreement, Plaintiff has suffered damages in an amount exceeding $1,000,000, to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**(Against Kenneth Feinberg)**

**Tortious Interference with Contract**

53.     Plaintiff realleges each and every prior allegation herein.

54.     The Equity Transaction Agreement was a valid contract between Plaintiff and Courtroom Connect, Inc.

55.     Defendant Kenneth Feinberg had actual knowledge of the Equity Transaction Agreement at the time he communicated the repudiation of that Agreement on November 18, 2013.

56.     Defendant Kenneth Feinberg repudiated the Equity Transaction Agreement with the intent to breach the Agreement and the repudiation was without legal justification.

57.     Defendant Kenneth Feinberg's repudiation directly and proximately caused Courtroom Connect, Inc.'s breach of the Equity Transaction Agreement.

58.     As a direct and proximate result of Defendant Kenneth Feinberg's tortious interference with the Equity Transaction Agreement, Plaintiff has suffered damages in an amount exceeding $1,000,000, to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**(Against All Defendants)**

**Promissory Estoppel**

59.     Plaintiff realleges each and every prior allegation herein.

60.     Defendant David Feinberg executed the Equity Transaction Agreement purportedly on behalf Courtroom Connect, Inc., purportedly in his role as CEO of Courtroom Connect, Inc.

61.     David Feinberg held himself out to Shane and to the public as CEO of Courtroom Connect, Inc., as well as a member of its Board of Directors.  Furthermore, David Feinberg had

previously made decisions and entered into contracts that were binding on Courtroom Connect, Inc., including the hiring and firing of personnel, executing agreements with vendors and customers, and obtaining financing and lines of credit for Courtroom Connect, Inc. Accordingly, David Feinberg reasonably should have expected that Plaintiff believed he had the authority to bind Courtroom Connect, Inc. to the Equity Transaction Agreement and that Plaintiff would therefore rely on the promises set forth in the Equity Transaction Agreement.

62. Defendant Kenneth Feinberg was aware that David Feinberg held himself out to the public and to Shane as CEO of Courtroom Connect, Inc., as well as a member of its Board of Directors. And because Kenneth Feinberg gave David Feinberg the authority to oversee the operations of Courtroom Connect, he knew that David had made decisions and entered into contracts that were binding on Courtroom Connect, Inc., including the hiring and firing of personnel, executing agreements with vendors and customers, and obtaining financing and lines of credit for Courtroom Connect. Accordingly, when Kenneth Feinberg discovered the Equity Transaction Agreement, he reasonably should have expected that Plaintiff signed the agreement, believing that David Feinberg had the authority to bind Courtroom Connect, Inc. to the Equity Transaction Agreement and that Plaintiff therefore had reasonably relied on the promises set forth in the Equity Transaction Agreement.

63. Courtroom Connect, Inc. is vicariously liable for David Feinberg's conduct because David Feinberg acted within the scope of his purported authority as CEO, and thus David Feinberg's reasonable expectation that Plaintiff would rely on the promises made in the Equity Transaction Agreement is imputable to Courtroom Connect, Inc.

64. Plaintiff reasonably relied on the promises set forth in the Equity Transaction Agreement to its detriment.

65. Courtroom Connect, Inc. breached the Equity Transaction Agreement as a result of Defendant Kenneth Feinberg's repudiation of the Agreement or because Defendant David Feinberg lacked actual authority to bind Courtroom Connect, Inc. to the Equity Transaction Agreement.

66. Courtroom Connect, LLC is liable to Plaintiff for Courtroom Connect, Inc.'s conduct as a successor-in-interest or alter-ego of Courtroom Connect, Inc.

67. Courtroom Connect Corp. is liable to Plaintiff for Courtroom Connect, Inc.'s conduct as an alter-ego of Courtroom Connect, Inc.

68. Plaintiff has suffered damages as a direct and proximate result of his reasonable reliance on the promises set forth in the Equity Transaction Agreement, which were not honored, in an amount well exceeding $1,000,000, to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**(Against Defendants David Feinberg, Courtroom Connect, Inc., Courtroom Connect, LLC, and Courtroom Connect Corp.)**

**Fraud**

69. Plaintiff realleges each and every prior allegation herein.

70. Defendant David Feinberg executed the Equity Transaction Agreement purportedly on behalf Courtroom Connect, Inc., in his role as CEO of Courtroom Connect, Inc. with the intent to induce Plaintiff to perform its obligations under that Agreement.

71. David Feinberg falsely represented to Plaintiff that he had the authority to bind Courtroom Connect, Inc. to the Equity Transaction Agreement, and knew that representation to be false when made.

72. Plaintiff relied on David Feinberg's false representation that he had the authority to bind Courtroom Connect, Inc. to the Equity Transaction Agreement when Plaintiff entered into the Equity Transaction Agreement.

17

73. Defendant Courtroom Connect, Inc. is vicariously liable for David Feinberg's misrepresentations because he made those misrepresentations as an agent of Courtroom Connect, Inc., and acted with either implied or express authority to make those representations to Plaintiff, with the purpose of benefitting Courtroom Connect, Inc.

74. Courtroom Connect, LLC is liable to Plaintiff for Courtroom Connect, Inc.'s conduct as a successor-in-interest or alter-ego of Courtroom Connect, Inc.

75. Courtroom Connect Corp. is liable to Plaintiff for Courtroom Connect, Inc.'s conduct as an alter-ego of Courtroom Connect, Inc.

76. Plaintiff has suffered damages as a direct and proximate result of his reasonable reliance on the promises set forth in the Equity Transaction Agreement, which were not honored, in an amount well exceeding $1,000,000, to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### (Against Defendant Kenneth Feinberg)

### Aiding and Abetting

77. Plaintiff realleges each and every prior allegation herein.

78. Defendant Kenneth Feinberg was aware for years that Shane was providing consulting services for the benefit of Courtroom Connect, Inc., and that David Feinberg had induced Shane to do so.

79. When Kenneth Feinberg discovered the Equity Transaction Agreement, he also realized that David Feinberg had fraudulently induced MSE to perform consulting services based on the false representation that David Feinberg had the authority to bind Courtroom Connect to the transaction.

80. By failing to cause Courtroom Connect, Inc. to honor its obligations under the Equity Transaction Agreement, knowing that the Agreement was procured through David

Feinberg's false representations, and by repudiating the Agreement, Kenneth Feinberg substantially assisted Defendants David Feinberg and Courtroom Connect, Inc. in accomplishing the fraud.

81. By repudiating the Equity Transaction Agreement, Kenneth Feinberg directly and proximately caused Plaintiff to suffer damages in an amount exceeding $1,000,000, to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

A. An order awarding Plaintiff compensatory damages in an amount to be determined at trial;

B. An order declaring the Equity Transaction Agreement valid and enforceable, and awarding Plaintiff specific performance under the Equity Transaction Agreement for all Equity Transactions that have occurred and will occur within the ten-year term of the Agreement;

C. An order awarding Plaintiff punitive damages in an amount to be determined at trial to punish Defendants for their wanton, reckless, and malicious acts described herein, and to protect society against similar acts.

D. An order awarding Plaintiff the costs of this suit, including reasonable attorneys' fees.

E. An order awarding pre-judgment and post-judgment interest.

F. An order awarding such other and further relief that this Court deems necessary and appropriate.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: May 31, 2016

>Respectfully submitted,
**CREIZMAN PLLC**

By: /s/ Melissa A. Madrigal
Melissa Madrigal, Florida Bar No. 93241
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 972-0200
Facsimile: (646) 200-5022
Email: mmadrigal@creizmanllc.com

*Attorneys for Plaintiff*
*Michael Shane Enterprises, LLC*